**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                        :
ANTHONY ABENANTE,                       :
                                        :
            Plaintiff,                   :
                                        :         Civil Action No. 06-4044 (JAG)
                 v.                     :
                                        :              **OPINION**
COMMISSIONER OF SOCIAL                  :
SECURITY ADMINISTRATION,                :
                                        :
            Defendant.                   :
_____:

**GREENAWAY, JR., U.S.D.J.**

Plaintiff Anthony Abenante ("Plaintiff") seeks review of the Commissioner of Social

Security Administration's ("Commissioner") decision denying his application for Disability

Income Benefits ("DIB"), pursuant to 42 U.S.C. § 405(g).[1]  Plaintiff argues that the

Commissioner's decision is not supported by substantial evidence, as required by § 405(g), and

should be reversed.  For the reasons set forth in this Opinion, this Court finds that the

Commissioner's decision is supported by substantial evidence and should be affirmed.

_____

[1]  This section of the Social Security Act (hereinafter the "Act") provides that any individual may obtain a review of any final decision of the Commissioner made subsequent to a hearing to which he or she was a party.  The federal district court for the district in which the plaintiff resides is the appropriate place to bring such action.  42 U.S.C. § 405(g).

# I. <u>PROCEDURAL HISTORY</u>

On May 30, 2003, Plaintiff filed an application for DIB, pursuant to Sections 216(i) and

223 of the Social Security Act (the "Act"), codified as 42 U.S.C. §§ 416(i) and 423, respectively.

(Tr. 18, 123-25.)[2]  Plaintiff's application alleges that his disability, chronic active hepatitis, has

impeded his ability to work since March 19, 2003.  (Tr. 133-34.)  After Plaintiff's application

was denied, Plaintiff filed a request for reconsideration on May 4, 2004.  (Tr. 101, 106-07.)  The

denial was affirmed on May 21, 2004.  (Tr. 107-10.)  Plaintiff subsequently requested review of

his application and a hearing before an Administrative Law Judge.  (Tr. 111.)  Plaintiff's request

was granted on September 30, 2004.  (Tr. 112.)

Plaintiff appeared before Administrative Law Judge Gerald J. Ryan ("ALJ Ryan") on

September 1, 2005.  (Tr. 65, 118.)  ALJ Ryan issued a decision on November 8, 2005, finding

that Plaintiff was not entitled to DIB under Sections 216(i) and 223 of the Act.  (Tr.15-23.)   ALJ

Ryan made the following findings:

> 1.      The claimant met the disability insured status requirements
>         on March 19, 2003, and continued to meet them through
>         the date of ALJ Ryan's decision.
>
> 2.      The claimant was not engaged in substantial gainful activity
>         since March 19, 2003.

---

[2]  The Act instructs the Secretary to file, as part of her answer, a certified copy of the
transcript of the record, including any evidence used to formulate her conclusion or decision.  42
U.S.C. § 405(g). "Tr." refers to said transcript.

The record also shows that Plaintiff first filed a separate DIB application on February 9, 1990 and
was awarded a period of benefits terminating in December, 2000.  (Tr. 92.)  On March 18, 2003,
an Administrative Law Judge affirmed the termination of Plaintiff's benefits.  (Tr. 92-96.)  This
decision was remanded, however, and an administrative hearing was held on March 16, 2006 and
May 23, 2006.  (Tr. 24-62.)

3. The medical evidence established that the claimant had a "severe" impairment involving chronic hepatitis and depression but did not disclose medical findings which meet or equal in severity the clinical criteria of any impairment listed in Appendix 1, Subpart P to Regulations No. 4.

4. The claimant's subjective complaints of disabling pain and other symptoms and limitation[s] precluding all significant work activity were not credited or supported by the evidence.

5. The claimant's residual functional capacity was, since March 19, 2003, limited to performing light work involving the types of simple tasks associated with unskilled work.

6. The claimant was a younger individual at all material times and has a GED.

7. The claimant did not have skills that were transferable to other work within the determined residual functional capacity.

8. The claimant did not have the residual functional capacity to perform any past relevant work.

9. The claimant had, since March 19, 2003, the residual functional capacity to perform jobs that existed in significant numbers in the national economy, pursuant to Medical-Vocational "grid" Rule 202.20, 20 C.F.R. Part 404, Appendix 2 to Subpart P, Regulations No. 4.

10. The claimant was not disabled as defined by the Social Security Act and its regulations.

(Tr. 22-23.)

Based on these findings, ALJ Ryan concluded that Plaintiff is not entitled to a period of disability or eligible for DIB under Sections 216(i) and 223 of the Act. (Tr. 23.) On November 10, 2005, Plaintiff requested a review of ALJ Ryan's decision. (Tr. 13-14.) On July 17, 2006,

the Appeals Council denied Plaintiff's request for review.  (Tr. 4-6.)  Pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g), Plaintiff filed the instant action, seeking reversal of the Commissioner's decision.

## II.  <u>STATEMENT OF THE FACTS</u>

### A.       <u>Background</u>

Plaintiff was born on June 4, 1956, is single, and lives alone in an apartment.  (Tr. 67.) He completed high school and two years of college equivalency, (Tr. 67-68) and has no difficulty reading or writing in English.  (Tr. 68.)  Plaintiff completed vocational training as an auto mechanic in 1976.  (Tr. 138.)  Plaintiff worked as landscaper from June 1980 through June 1986, and as a construction laborer from July 1986 to December 1989.  (Tr. 135.)  His duties as a laborer consisted of placing tarp on tractor trailer trucks, lifting pipes weighing as much as fifty pounds, and carrying sheets of plywood that weighed between five and twenty pounds.  (Tr. 134-35, 143.)  While working in construction, Plaintiff testified that, each day, he walked for five hours and stood for one hour.  (Tr. 135.)

### B.       <u>Claimed Disability</u>

According to his testimony, Plaintiff ceased working on December 15, 1989, due to chronic hepatitis.[3]  (Tr. 70, 150.)  Plaintiff claims that his present ailments stem from an on-the-job injury that occurred on September 8, 1988, when a needle punctured Plaintiff's leg while he was working on a tractor trailer. (Tr. 150.)  In his disability report, Plaintiff alleged that he is

---

[3] Hepatitis is defined as "an inflammatory condition of the liver, characterized by jaundice, hepatomegaly, anorexia, abdominal and gastric discomfort, abnormal liver function, clay colored stools, and tea-colored urine. . . . The liver usually is able to regenerate its tissue, but severe hepatitis may lead to cirrhosis and chronic liver dysfunction."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 804 (6th ed. 2002).

4

unable to work because he suffers from "fatigue, joint pain, indigestion, insomnia and memory problems." (Tr. 133.) In his testimony before ALJ Ryan, Plaintiff alleged that he lost approximately twenty pounds over the course of one year due to stress and anxiety. (Tr. 68.) Plaintiff also testified that he suffers from depression, which significantly decreases his energy level and his ability to work. (Tr. 69.) He also stated that he can only stand for a few hours, and cannot remain in a seated position, because the chronic active hepatitis causes anxiety and agitation. (Tr. 75-76.) Plaintiff stated that he often feels the need to lay down during the course of the afternoon. (Id.)

Plaintiff testified that he takes a nap every day from two or three o'clock until five or six o'clock. (Tr. 83.) Plaintiff contends that he has problems with his memory and concentration due to the fatigue caused by his chronic hepatitis. (Tr. 77.) He also testified that he took several prescription and over-the-counter medications for his ailments, including anti-depressants and antibiotics. (Tr. 71-72.)

**C.    Medical Evidence Considered by the ALJ**

The record indicates that several physicians have evaluated Plaintiff.

1.    Physical Evaluations

a.    *Dr. Carroll B. Leevy,  MD, MACP*

Dr. Carroll B. Leevy provided Plaintiff with medical treatment between October 2002 and September 2005. (Tr. 258 - 301.) Dr. Leevy's visit reports indicate that Plaintiff suffers from hepatitis non-A, non-B, and non-C. (Tr. 262, 265, 274, 278, 291, 301.) In a letter dated September 2, 2005, Dr. Leevy expressed that Plaintiff had "chronic liver disease manifested by severe fatigue which is produced by stress producing a significant increase in liver enzymes."

5

(Tr. 258.)

Plaintiff visited Dr. Leevy approximately once every four to six weeks for laboratory testing and check-ups.  (Tr. 79-80.)  The record indicates that Dr. Leevy performed approximately fifteen laboratory tests over this period, all of which reflected normal alt,[4] ast,[5] albumin,[6] and bilirubin[7] levels.  (Tr. 259-301.)  Dr. Leevy's progress notes indicate that Plaintiff's subjective complaints often consisted of fatigue and tiredness.  (Tr. 262-301.)  At one appointment,  Plaintiff also reported suffering from myalgia.[8]  (Tr. 278, 281.)  Plaintiff also reported cold symptoms such as a fever, sore throat, coughing, and difficulty swallowing.  (Tr.

_____

[4]  ALT, an abbreviation of alanine aminotransferase, is defined as "[a]n enzyme normally present in the serum and tissues of the body, especially the liver.  The enzyme is released into the serum as a result of tissue injury and increases in persons with acute liver damage. . . . Elevated levels of ALT are highly specific in indicating hepatocellular disease."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 58, 70 (6th ed. 2002).

[5]  AST, an abbreviation of aspartate aminotransferase, is defined as "[a]n enzyme normally present in body serum and in certain body tissues, especially those of the heart and liver. . . . The enzyme is released into the serum because of tissue injury and thus may increase as a result of . . . liver damage."  The AST test is "a blood test used in the evaluation of suspected . . . hepatocellular diseases."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 142, 146 (6th ed. 2002).

[6]  Albumin is defined as "a water soluble heat coagulable protein."  An albumin test consists of "any of several tests for the presence of albumin, a class of simple proteins, in the urine, a common sign of renal or chronic disease."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 60 (6th ed. 2002).

[7]  Bilirubin is defined as "the orange yellow pigment of bile, formed principally by the breakdown of hemoglobin in red blood cells after termination of their normal life span. . . . Testing for bilirubin in the blood provides information for diagnoses and evaluation of liver disease . . . ."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 203 (6th ed. 2002).

[8]  Myalgia is defined as "diffuse muscle pain, usually accompanied by malaise," or a vague uneasy feeling of body weakness, distress, or discomfort.  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 1044, 1136 (6th ed. 2002).

274, 285, 291.)  Dr. Leevy's notes suggest, however, that Plaintiff felt well during some visits.

(Tr. 265, 281.)  In the visit record dated July 18, 2005, Dr. Leevy noted that Plaintiff takes

seventy-five milligrams of Tofranil,[9] one milligram of Lorazepam,[10] and twenty milligrams of

Prilosec.[11] (Tr. 262.)

> b. *Dr. Biagio DiStaso*

The June 6, 2003 medical report drafted by Dr. Biagio DiStaso, Plaintiff's treating

physician since 1990, stated that Plaintiff was diagnosed with hepatitis after having undergone a

liver biopsy.  (Tr. 175.)  The report indicates that Plaintiff has "no limitation" in his ability to lift

and carry objects, stand, or walk.  (Tr. 176.)  Finally, Dr. DiStaso assessed that there were no

"other conditions that limit . . . [Plaintiff's] ability to do work related activities."  (Id.)  Two

laboratory tests performed by Dr. DiStaso on October 30, 2002 and February 12, 2003 indicated

normal results from the hepatic function panel tests.  (Tr. 302, 304-06.)

---

[9]  Tofranil is a brand name of imipramine, an antidepressant that is used to treat depression.  MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682389.html (last visited Oct. 30, 2007).

[10]  Lorazepam is a medication that is used to relieve anxiety. MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682053.html (last visited Oct. 30, 2007).

[11]  Omeprazole is used alone or with other medications to treat ulcers, gastroesophageal reflux disease (GERD), and erosive esophagitis.  It may also be used to treat conditions in which the stomach produces too much acid.  MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a693050.html (last visited Oct. 30, 2007).

c.      *Dr. Michael Pollack*

On March 25, 2004, consultive physician Dr. Michael Pollack examined Plaintiff.  (Tr. 241-53.)  Plaintiff's subjective complaints included "generalized weakness, fatigue, [and] intermittent abdominal pain."  (Tr. 241.)  The Plaintiff also complained of bilateral knee pain. (Id.)  Dr. Pollack noted that Plaintiff had received Interferon therapy[12] but no longer took any medications to treat chronic liver disease.  (Id.)

Dr. Pollack made the following assessments of Plaintiff's physical condition: (1) blood pressure and pulse are regular; (2) "visual acuity" in the right and left eye; (3) appearance is "well-developed [and] well-nourished in no acute distress"; (4) no difficulty "ambulating," sitting and standing, or maneuvering during the examination; (5) negative hepatosplenomegaly;[13] and (6) negative ascites.[14]  (Tr. 242.)  Dr. Pollack's neurological evaluation reflected that Plaintiff was "alert and oriented," had no speech impediments, and had "adequate" communication skills. (Id.)  Dr. Pollack concluded that Plaintiff has "[c]hronic liver disease, status post Interferon therapy by history and background documentation."  (Id.)

---

[12]  Interferon is defined as "a natural glycoprotein formed by cells exposed to a virus or another foreign particle of nucleic acid.  It induces the production of translation inhibitory protein (TIP) in non-infected cells.  TIP blocks translation of viral RNA, thus giving other cells protection against both the original and other viruses."  Interferon alfacon-1 therapy " is used to treat chronic hepatitis C infections." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 907 (6th ed. 2002).

[13]  Hepatosplenomegaly is defined as the "enlargement of the spleen and liver."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 807 (6th ed. 2002).

[14]  Ascites is defined as "an abnormal intraperitoneal accumulation of fluid containing large amounts of protein and electrolytes. . . . Ascites [may be] a complication . . . of cirrhosis, congestive heart failure, nephrosis . . . or various fungal and parasitic diseases."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 140 (6th ed. 2002).

2.          Psychological Evaluations

          a.          *Dr. Charles Hasson, Ph.D.*

On February 16, 2004, Dr. Charles Hasson, a state psychological consultant, examined Plaintiff's mental condition, including his cognitive memory function.  (Tr. 214-22.)  During Plaintiff's clinical interview, Plaintiff recounted to Dr. Hasson that "in September of 1988, while working on his [construction] job, he was stuck with a needle which subsequently caused him to develop Hepatitis-C."  (Tr. 214.)  Plaintiff also reported receiving a cash settlement from a malpractice lawsuit regarding his injury.  (Tr. 215.)

Plaintiff stated that, because of his condition, he suffers from "headaches, joint pain, insomnia, and nervousness."  (Id.)  Plaintiff reported that he is prone to forgetfulness and has difficulty concentrating.  (Id.)  When asked by Dr. Hasson whether he could endure the stress and physical exertion of a job, Plaintiff stated, "[N]o, I cannot work because I am tired, nervous, have joint pain, headaches, and cannot concentrate."  (Id.)  Plaintiff further reported that he has not received any psychiatric treatment since 1988.  (Tr. 218.)  He also stated that he took seventy-five milligrams of Tofranil at night to alleviate his insomnia.  (Id.)

Dr. Hasson noted that Plaintiff avoided eye contact during the interview and "appeared mildly apprehensive," his face becoming flushed when he became tense.  (Tr. 216.)  When asked to describe his mood, plaintiff responded that he felt "tired."  (Tr. 217.)  Dr. Hasson remarked that "it appeared . . . that the claimant made a big show of having difficulty getting in and out of his chair and also had to get up periodically during the clinical interview [because] he felt restless

9

and in pain . . . ."  (Id.)  Dr. Hasson also noted that Plaintiff "impressed [him] as being guarded and unwilling to reveal himself," and was not "a reliable informant."  (Id.)

Dr. Hasson found Plaintiff's mental status "was alert . . . [with] a clear sensorium."[15] (Id.)  Plaintiff was able to spell his name backward and forward and was able to do mental math accurately, but was unable to recall digits or spell the word "world" backward.  (Id.)  Plaintiff knew the name of the current President of the United States, but could not recall words Dr. Hasson communicated to him less than five minutes ago.  (Id.)  Plaintiff was able to perform daily living activities, such as dressing and grooming himself, driving, talking on the telephone, mailing letters at the post office, and managing financial matters.  (Tr. 215.)  Plaintiff stated, however, that he is unable to cook for himself and that a cleaning person performs chores around his apartment about once every two weeks.  (Id.)  He also reported that he is able to get along with other people and has some male friends, but was not dating anyone.  (Tr. 215.)  Dr. Hasson highlighted that Plaintiff was able to drive himself from his home in Rutherford to the clinical interview without assistance.  (Tr. 218.)  Dr. Hasson reasoned that Plaintiff's ability to navigate the driving directions from his home to the clinical interview was inconsistent with his low memory score.  (Id.)

Dr. Hasson classified Plaintiff as having "a mild adjustment disorder caused by his awareness of his illness."  (Id.)  For example, Plaintiff stated, "I have a good personality, but feel bad about myself because of my medical problems."  (Tr. 217.)  According to Dr. Hasson,

---

[15]  Sensorium is defined as "the part of the consciousness that includes the special sensory perceptive powers and their central correlation and integration in the brain.  A clear sensorium conveys the presence of a reasonably accurate memory together with a correct orientation for time, place, and person."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 1563 (6th ed. 2002).

Plaintiff's disorder was "compounded by having dependent traits which make it difficult for him to assert himself and to engage others."  (Id.)

Dr. Hasson also evaluated Plaintiff's mental and physical condition according to the DSM-IV multiaxial scale.[16]  (Tr. 218.)  On Axis I, Dr. Hasson found that Plaintiff was malingering his memory impairment.  (Id.)  He also noted that Plaintiff had an "Adjustment Disorder with [an] anxious mood (stress from social isolation, financial difficulties, and awareness that he has Hepatitis-C)."  (Id.)  Dr. Hasson's Axis V analysis yielded a global assessment of functioning ("GAF") score of 75, indicating transient symptoms.[17]  (Id.)

Dr. Hasson also evaluated Plaintiff's memory with the Wechsler Memory Scale-III test, which revealed very impaired memory functioning.  (Tr. 222.)  Plaintiff achieved a general memory index score of 47, which is "in the memory deficient range."  (Id.)  Dr. Hasson found "a discrepancy between [Plaintiff's] ability to express himself verbally and his claimed impairment in memory and cognitive function."  (Tr. 217.)

b.     *Dr. Jane Curran, Ph.D.*

On March 4, 2004, Dr. Jane Curran, a state agency psychologist, evaluated Plaintiff's

_____

[16]  The DSM-IV multiaxial scale assesses an individual's mental and physical characteristics along five axes. Axis I assesses clinical disorders, and Axis V assesses the subject's global assessment of functioning ("GAF").  American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: FOURTH EDITION 27 (Text Revision 2000).

[17]  A GAF scale ranges from 0 to 100.  Generally, a lower score indicates a more serious mental disorder.  A score of 0 stands for "inadequate information," and a score of 100 indicates "[s]uperior functioning in a wide range of activities."  American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: FOURTH EDITION 27 (Text Revision 2000).  "A GAF of 70-80 reflects a score within the range of symptoms described as transient and expectable reactions to psychosocial stresses; no more than slight impairment in social, occupational, or school functioning."  Id.

residual functional capacity ("RFC").  (Tr. 227-40.)  Dr. Curran affirmed the mental impairments

first referenced in Dr. Hasson's DSM-IV multiaxial scale assessment.  (Tr. 232, 234.)  Dr. Curran

then performed a functional capacity assessment[18] and found that Plaintiff had no difficulty

performing daily activities; mild difficulties maintaining social functioning; and moderate

difficulty maintaining concentration, persistence, or pace.  (Tr. 237.)  The assessment also

revealed that Plaintiff had experienced no episodes of decompensation.[19]  (Id.)  Dr. Curran

concluded:

> The claimant is able to understand, remember and execute simple
> instructions on a consistent and sustained basis.  He is able to make
> simple decisions.  He can respond appropriately to supervisors and
> co-workers.  He is able to deal with routine changes.  In summary, he
> can meet the basic mental demands of unskilled work.

(Tr. 239.)

   c. *Dr. Ed Kamin, Ph.D.*

   Dr. Ed Kamin, a consultative state agency physician, reviewed the evidence in Plaintiff's

---

[18]  The evaluation of mental impairments involves rating the degree of functional limitation.  See generally  20 C.F.R. § 404.1520a.  An applicant's functional limitation is rated based on the extent to which an impairment interferes with the applicant's "ability to function independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § 404.1520a(c)(2).  The degree of one's functional limitation is rated in the areas of (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  20 C.F.R. § 404.1520a(c)(4).  In rating the first three functional areas, a five-point scale is used: "[n]one, mild, moderate, marked, and extreme."  Id.  In rating the fourth functional area, a four point scale is used: "[n]one, one, or two, three, four or more."  Id.  "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity."  Id.

[19]  "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  20 C.F.R. Pt. 404, Subpt. P, App. 1.

file as created by Dr. Curran, including Plaintiff's functional assessment, and affirmed Dr.

Curran's March 4, 2004 opinion that Plaintiff was able to meet the mental demands of unskilled

work.  (Tr. 227, 239.)

          d.    *Dr. Judith Kernodle*

Dr. Judith Kernodle, a private psychiatrist, evaluated Plaintiff on February 3, 2004, and

wrote a letter to Plaintiff's attorney, dated July 20, 2004, which summarized Plaintiff's condition.

(Tr. 255.)  Dr. Kernodle stated that Plaintiff had "complaints of chronic depression and fatigue

which he associated with his primary illness of chronic hepatitis."  (Id.)  Plaintiff also reported

"fatigue, restless sleep and some weight loss."  (Id.)  Dr. Kernodle observed that Plaintiff was

grieving the loss of his mother who had passed away one year earlier.  (Id.)  Further, she found

that Plaintiff was "lonely and isolated at times."  (Id.)  Dr. Kernodle concluded that Plaintiff's

symptoms "were not necessarily associated with depressed mood, and he did endorse pleasure in

life."  (Id.)

Dr. Kernodle prescribed Effexor XR[20] to treat Plaintiff's depression, and noted that he

had previously taken Tofranil at a dosage of seventy-five milligrams per day.  (Id.)  Dr. Kernodle

diagnosed Plaintiff with "Major Depressive Disorder, [which was] moderate [and] in remission."

(Id.)  She also noted that she had not treated Plaintiff when his symptoms were allegedly more

severe.  (Id.)  Dr. Kernodle subsequently provided Plaintiff with supportive psychotherapy

approximately once a month, and has since concluded that Plaintiff "continues to do well from a

---

[20] Effexor XR is a brand name for venlafaxine, which is used to treat depression and
anxiety disorder. MedlinePlus,
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694020.html (last visited Oct. 30,
2007).

psychiatric standpoint." (Id.)


### III.  DISCUSSION

A.    Standard of Review

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. §

405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial

evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Stunkard v. Sec'y of Health and Human Servs., 841

F.2d 57, 59 (3d Cir. 1988); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of

evidence but may be less than a preponderance."  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.

1988) (citing Stunkard, 841 F.2d at 59).  The reviewing court must consider the totality of the

evidence and then determine whether there is substantial evidence to support the Commissioner's

decision.  See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).  Furthermore, the reviewing

court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-

finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom

Williams v. Shalala, 507 U.S. 924 (1993) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir.

1984)).

In determining whether there is substantial evidence to support the Commissioner's

decision, the reviewing court must consider "(1) the objective medical facts; (2) the diagnoses

and expert opinions of treating and examining physicians on subsidiary questions of fact; (3)

subjective evidence of pain testified to by the claimant and corroborated by family and neighbors;

and (4) the claimant's educational background, work history and present age." Blalock v.

Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D. N.J.

1981). Where there is substantial evidence to support the Commissioner's decision, it is of no

consequence that the record contains evidence that may also support a different conclusion.

Blalock, 483 F.2d at 775.

**B.**     **Statutory Standards**

The claimant bears the initial burden of establishing his or her disability.  42 U.S.C. §

423(d)(5)(A).  To qualify for DIB, a claimant must first establish that he is "disabled."  42 U.S.C.

§ 432(a)(1).  A claimant is deemed "disabled" under the Act if he is unable to "engage in

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A); see also

Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  That is, the claimant's impairment must be

so severe that he "is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A); see also Nance v. Barnhart, 194

F. Supp. 2d 302, 316 (D. Del. 2002).  Finally, while subjective complaints of pain are considered,

they alone are insufficient to establish a disability.  42 U.S.C. § 423(d)(5)(A).  An impairment

only qualifies as a disability if it "results from anatomical, physiological or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques."  42 U.S.C. § 423(d)(3).

**C.**    **The Five-Step Evaluation Process And The Burden of Proof**

Determinations of disability are made by the Commissioner, pursuant to the five-step process outlined in 20 C.F.R. § 404.1520.  At the first step of the review, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity.[21]  20 C.F.R. § 404.1520(b).  If a claimant is found to be engaged in such activity, the claimant is not "disabled," and the disability claim will be denied.  Id.; Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two, in which the Commissioner must determine whether the claimant is suffering from a severe impairment.  20 C.F.R. § 404.1520(a)(4)(ii), (c).  An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities . . . ."  20 C.F.R. § 404.1520(c).  In determining whether the claimant has a severe impairment, the age, education, and work experience of the claimant will not be considered.  Id.

If the claimant is found to have a severe impairment, the Commissioner addresses step three of the process by comparing the medical evidence of the claimant's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1594(f)(2).  If the claimant's impairment meets or equals one of the listed impairments, he will be found disabled under the Social Security Act.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the

---

[21]  Substantial gainful activity is "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

Third Circuit Court of Appeals found that, if denying the applicability of other listings[22] at step three, the ALJ must specify which listings apply and give reasons why those listings are not met or equaled.  In <u>Jones v. Barnhart</u>, 364 F.3d 501, 505 (3d Cir. 2004), however, the court noted that "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.  Rather, the function of <u>Burnett</u> is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  (<u>Id.</u>)  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant [l]isting."  <u>Scatorchia v. Comm'r of Soc. Sec.</u>, 137 F. App'x 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform his past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant is able to perform his past relevant work, he will not be found disabled under the Act.  In <u>Burnett</u>, the Third Circuit set forth the analysis at step four:

> In step four, the ALJ must determine whether a claimant's residual functional capacity enables her to perform her past relevant work. This step involves three substeps: (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

<u>Burnett</u>, 220 F.3d at 120.  If the claimant is unable to resume his past work, and his

---

[22]  Hereinafter, "listing" refers to the list of severe impairments as found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

condition is deemed "severe," yet not listed, the evaluation moves to the final step.

At step five, the burden of production shifts to the Commissioner, who must demonstrate that there are other jobs existing in significant numbers in the national economy that the claimant can perform, consistent with his medical impairments, age, education, past work experience, and residual functional capacity.  20 C.F.R. § 404.1560(c)(1).  If the ALJ finds a significant number of jobs that the claimant can perform, the claimant will not be found disabled.  Id.

When the claimant has only exertional limitations, the Commissioner may utilize the Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2 to meet his burden of establishing the existence of jobs in the national economy.  These guidelines dictate a result of "disabled" or "not disabled" according to combinations of vocational factors, i.e., age, education level, work history, and residual functional capacity.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(a).  These guidelines reflect the administrative notice taken of the number of jobs in the national economy that exist for a given combination of vocational factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).  When the vocational factors coincide with all of the criteria of a rule, the rule directs a conclusion as to whether an individual is disabled.  20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S. 458, 467 (1983).  The claimant, however, may rebut any finding of fact as to a vocational factor.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner, in the five-step process, "must analyze the cumulative effect of the claimant's impairments in determining whether she is capable of performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  "[T]he combined impact of the impairments will be considered

throughout the disability determination process."  20 C.F.R. § 1523; <u>see also</u> 42 U.S.C. § 423(d)(2)(B); <u>Parker v. Barnhart</u>, 244 F. Supp. 2d 360, 369 (D. Del. 2003).  The burden, however, remains on the claimant to prove that the impairments in combination are severe enough to qualify him for benefits.  <u>See</u> <u>Williams v. Barnhart</u>, 87 F. App'x 240, 243 (3d Cir. 2004) (placing responsibility on the claimant to show how a combination-effects analysis would have resulted in a qualifying disability); <u>see also</u> <u>Marcus v. Barnhart</u>, No. 02-3714, 2003 WL 22016801, at *2 (E.D. Pa. June 10, 2003) (stating that "the burden was on [claimant] to show that the combined effect of her impairments limited one of the basic work abilities").

While <u>Burnett</u> involved a decision in which the ALJ's explanation of his step three determination was so inadequate as to be beyond meaningful judicial review, the Third Circuit applies its procedural requirements, as well as its interpretation of <u>Jones</u>, to every step of the decision.  <u>See, e.g.</u>, <u>Rivera v. Comm'r</u>, No. 05-1351, 2006 U.S. App. LEXIS 2372, at *3 (3d Cir. Jan. 31, 2006).  Thus, at every step, "the ALJ's decision must include sufficient evidence and analysis to allow for meaningful judicial review," but need not "adhere to a particular format." <u>Id.</u>

**D.**     **<u>ALJ Ryan's Findings</u>**

ALJ Ryan applied the five-step sequential evaluation described above, and determined that Plaintiff was not disabled within the meaning of the Act.  (Tr. 19.)  ALJ Ryan found that Plaintiff satisfied step one of the evaluation process because he had not engaged in substantial gainful activity since March 19, 2003.  (Tr. 20.)

At steps two and three of the evaluation, ALJ Ryan determined that Plaintiff suffers from a "severe impairment involving chronic hepatitis and depression," but concluded that the

evidence "does not disclose medical findings which meet the criteria of an impairment listed in Appendix 1, Subpart P to Regulations No. 4." (Id.) ALJ Ryan noted that the evidence in the record failed to establish that Plaintiff's liver disease met the criteria set forth in the "chronic liver disease" listing. (Id.) ALJ Ryan considered Plaintiff's subjective complaints, together with Dr. Leevy's medical observations, and concluded that the complaints were unreasonable and not credible. (Id.) In evaluating these subjective complaints, ALJ Ryan gave consideration to

> (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse side-effects of any pain medications; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities.

(Id.) ALJ Ryan emphasized that laboratory tests between 2002 and 2005 demonstrated "results [that were] within normal limits . . . ." (Id.) In support of this opinion, ALJ Ryan referenced Dr. Pollack's March 2004 report, which found that Plaintiff's liver disease, after treatment, had improved so significantly that it was only detectable upon reviewing the Plaintiff's medical history. (Tr. 21.) In his decision, ALJ Ryan stated that "[Plaintiff] has chronic liver disease and status post Interferon therapy **by history and documentation only**." (emphasis in original) (Tr. 19, 21.)

In determining whether Plaintiff's mental status significantly impaired his ability to perform basic work activities, ALJ Ryan considered the medical opinions of the state agency physicians and the applicable test set forth in 20 C.F.R. § 416.945(c). (Tr. 20.) ALJ Ryan analyzed whether Plaintiff's mental status met the criteria under the "affected disorder" category

of the "mental disorder" medical listing.[23]  (Id.)  After finding that Plaintiff's impairment fulfilled

the A Criteria, ALJ Ryan further noted that Plaintiff "had functional limitations of: mild

restrictions of activities of daily living; no difficulties in maintaining social functioning; mild

deficiencies of concentration, persistence, or pace; and no episodes of decompensation."  (Id.)

Noting that Plaintiff fulfilled the A Criteria, but not the B or C Criteria, ALJ Ryan concluded that

Plaintiff was "capable of dealing successfully in the work setting with instructions, co-workers,

supervisors and normal work stress."  (Id.)

    ALJ Ryan then discussed Plaintiff's independent consultative examination with Dr.

Hasson, performed in February 2004.  (Tr. 21.)  ALJ Ryan also referenced Dr. Hasson's finding

that Plaintiff was "malingering [his] memory impairment."  (Id.)  ALJ Ryan discussed the

discrepancy between Plaintiff's claimed memory impairment and low memory score, including

Plaintiff's ability to drive to the examination without assistance.  (Id.)  ALJ Ryan highlighted the

fact that Plaintiff had "no psychiatric treatment since 1988," and was only taking a "low-dose

---

    [23]  When evaluating an impairment to determine whether it meets or equals in severity
listing 12.00, entitled "Mental Disorders", the impairment must fulfill one of the nine categories
of mental disorder listings.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  One such category is labeled
"affective disorders."  Id.  The affective disorder listing is characterized by a disturbance of
mood, accompanied by a full or partial manic or depressive syndrome.  Id.  The claimant either
fulfills the criteria listed in paragraphs A and B of the affective disorder listing (the "A Criteria"
and the "B Criteria," respectively) or fulfills the A Criteria and the criteria listed in paragraph C
of the affective disorder listing (the "C Criteria").  Id.  To fulfill the A Criteria, the claimant must
suffer from one of the listed medically-determinable depressive or manic syndromes. Id.  To
fulfill the B Criteria, the claimant must, as a result of her illness, exhibit two of the following: (1)
marked restrictions in activities of daily living; (2) marked restrictions in social functioning; (3)
marked restrictions in concentration, persistence, or pace; or (4) have exhibited repeated episodes
of decompensation.  Id.  To fulfill the C Criteria, the claimant must exhibit a "medically
documented history of a chronic affective disorder of at least 2 years' duration that has caused
more than a minimal limitation of ability to do basic work activities," along with additional
symptoms specifically enumerated in the listing.  Id.

antidepressant for insomnia." (Id.)

ALJ Ryan determined that Plaintiff's mental impairments "had no greater effect than to limit him to performing the types of simple tasks associated with unskilled work." (Tr. 20.) Specifically, ALJ Ryan found that Plaintiff was able to perform:

> lifting and carrying objects weighing up to twenty pounds often; frequently lifting and carrying objects weighing up to ten pounds; standing, walking, and sitting for up to six hours in an eight-hour workday; pushing and pulling arm and leg controls; and light work involving the types of simple tasks associated with unskilled work.

(Id.) In sum, ALJ Ryan determined that the evidence failed to support Plaintiff's claimed disability. (Tr. 21.)

At step four of the evaluation, ALJ Ryan concluded that Plaintiff did not "ha[ve] the residual functional capacity to perform [his] past relevant work [as a landscaper or construction laborer]." (Tr. 21.) At step five of the evaluation, ALJ Ryan concluded that, as a result of Plaintiff's young age, high school education, vocational background, and work experience, he could perform jobs that "existed in significant numbers in the national economy." (Tr. 22.) Given these facts, ALJ Ryan determined that Plaintiff was not disabled, as defined in the Act. (Id.)

**E.    Analysis**

Plaintiff contends that ALJ Ryan's decision should be reversed or remanded because the decision is not supported by substantial evidence. (Pl. Br. 7.) Plaintiff argues that (1) ALJ Ryan improperly evaluated the objective medical evidence concerning Plaintiff's complaints of pain, mental impairment, and fatigue (Pl. Br. 8-12); (2) substantial evidence does not support ALJ Ryan's finding that Plaintiff's impairments did not meet or equal in severity any of the listings

because the impairments were considered separately, but not in combination (Pl. Br. 13-14); and

(3) ALJ Ryan erred as a matter of law in finding that Plaintiff possessed the necessary RFC to

perform light work involving the types of simple tasks associated with unskilled work (Pl. Br.

14-16).

      1.      Whether ALJ Ryan Properly Evaluated the Medical Evidence Concerning
              Plaintiff's Subjective Complaints of Pain

Plaintiff argues that ALJ Ryan disregarded his complaints "concerning his pain and

limitation of motion and function, and mental impairments including depression, anxiety,

irritability, low average intelligence, loss of concentration, memory loss and severe chronic

fatigue." (Pl. Br. 8.) Plaintiff contends that the above-listed impairments "are supported by the

objective [medical] findings." (Id.) ALJ Ryan took the claimant's subjective complaints of

disabling pain and other symptoms into consideration and ultimately ruled that the complaints

were not credible or consistent. (Tr. 20.)

In evaluating a claimant's subjective complaints of pain, the ALJ must adhere to the

standard set forth in Caruso v. Comm'r of Soc. Sec., 99 F. App'x 376, 380-81 (3d Cir. 1999).

First, the ALJ must determine from objective medical evidence whether the claimant suffers

from a medically-determinable impairment capable of causing the alleged symptoms. 20 C.F.R.

§ 404.1529; Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). If such an impairment is

present, the ALJ must make an independent determination regarding the intensity, persistence, or

functionally limiting effects of the symptoms on the claimant's ability to work. See 20 C.F.R. §

404.1529(a). If the extent of the claimant's pain or other symptoms exceeds what can be

substantiated by objective medical evidence, the ALJ must then determine the level of restriction

that the impairment may reasonably cause the claimant, based on statements and all the other

23

evidence in the case record.  Id.

The ALJ must give consideration to the claimant's subjective complaints of pain.  20

C.F.R. § 404.1529(a); Dorf v. Bowen, 794 F.2d 896, 902 (3d Cir. 1986).  Subjective complaints

alone, however, will not establish that a claimant is disabled.  20 C.F.R. § 404.1529(a).

Although "assertions of pain must be given serious consideration," Smith v. Califano, 637 F.2d

968, 972 (3d Cir. 1981), a claimant still "bears the burden of demonstrating that her subjective

complaints were substantiated by medical evidence."  Alexander v. Shalala, 927 F. Supp. 785,

795 (D. N.J. 1995), aff'd, 85 F.3d 611 (3d Cir. 1996).  Accordingly, subjective claims of pain

and impairment "will not alone establish . . . [disability]; there must be medical signs and

laboratory findings . . . [demonstrating] medical impairments, which could reasonably be

expected to produce the pain or other symptoms alleged."  20 C.F.R. § 404.1529(a).  The court

further noted in Alexander that "[e]ven in situations where a subjective complaint of pain

coincides with a known impairment, it is within the discretion of an ALJ to discount that claim if

there is a rational basis to do so."  Alexander, 927 F. Supp. at 795.

ALJ Ryan's conclusion that Plaintiff's chronic liver disease and depression did not satisfy

any of the listings was based, in significant part, on objective medical opinions.  ALJ Ryan noted

that Plaintiff's liver function as reflected in the laboratory testing results were "within normal

limits[,] although when out of range [were] not markedly [abnormal]."  (Tr. 20.)  In addition,

evidence in the record indicates that Plaintiff's prescription medications included "mostly

Prilosec, [some] over the counter analgesics, and low dose anti-depressants, which [Plaintiff]

specifically used for his insomnia."  (Id.)

ALJ Ryan relied on objective medical evidence to find that Plaintiff's mental impairment

did not fulfill the B Criteria or the C Criteria necessary to satisfy the affected disorder listing. ALJ Ryan noted that Plaintiff "has had functional limitation of: mild restrictions of activities of daily living; no difficulties in maintaining social functioning; mild deficiencies of concentration, persistence or pace; and no episodes of decompensation." (Id.)  In making this notation, ALJ Ryan relied on Dr. Curran's report, which indicated that Plaintiff's limitations were "mild" or "moderate," and not "marked" or "extreme."[24] (Tr. 237.)  ALJ Ryan's conclusion that Plaintiff was able to perform the types of simple tasks associated with unskilled work" was consistent with the recommendations of Dr. Curran and Dr. Kamin. (Tr. 20.)  This Court finds that ALJ Ryan properly relied upon Dr. Curran's assessment of Plaintiff in finding that Plaintiff's impairments did not meet or equal in severity the affected disorder listing, given that Plaintiff did not possess a "marked" limitation pursuant to the regulations.  (Id.)

Finally, ALJ Ryan properly discounted Plaintiff's subjective complaints of pain.  In determining the amount of weight to give Plaintiff's subjective complaints, ALJ Ryan discussed the findings of Dr. Hasson, who stated that Plaintiff was "malingering [his] memory impairment."  (Tr. 21.)  ALJ Ryan noted Dr. Hasson's observation that Plaintiff was capable of driving to the clinical interview without assistance despite receiving a severely deficient memory score of 47 on the Wechsler Memory Scale.  (Id.)  Based on the aforementioned facts supporting ALJ Ryan's decision, this Court finds that substantial evidence supports his finding that Plaintiff's subjective complaints of pain were properly evaluated and dismissed as uncredible.

---

[24] The report states that the "marked" and "extreme" limitation labels satisfy the functional criteria.  (Tr. 237.)

2.     Whether ALJ Ryan Erred in Concluding That Plaintiff's Impairments Did Not Meet or Equal a Listed Impairment

Plaintiff asserts that ALJ Ryan erred at step three of the sequential evaluation process because ALJ Ryan "discusse[d] [Plaintiff's] impairments separately[,] but at no time discusse[d] them in combination . . . ." (Pl. Br. 13.)  Specifically, Plaintiff claims that ALJ Ryan did not mention whether the combined effect of Plaintiff's impairments would constitute a listing.  (Id.)

Substantial evidence exists to support ALJ Ryan's conclusion that Plaintiff's chronic liver disease and depression did not separately, or in combination, meet the medical listing of 5.05(F)(3).   In memorializing his decision, the administrative law judge need not have a specific section dedicated to the assessment of the combined impact of Plaintiff's impairments.  Bryan v. Barnhart, No. 04-191, 2005 U.S. Dist. LEXIS 1493, at *3 (E.D. Pa. Feb. 2, 2005).  ALJ Ryan specifically addressed Plaintiff's liver disease impairment and concluded that the evidence failed to establish the criterion necessary to satisfy the "chronic liver disease" listing.  (Tr. 20.)  ALJ Ryan stated that "the evidence establishe[d] the existence of a 'severe' impairment involving chronic hepatitis and depression, but does not disclose medical findings which meet or equal in severity the clinical criteria of any impairment listed . . . ."  (Id.)

 ALJ Ryan states at the outset that the impairments involving chronic hepatitis and depression do not satisfy the listings.  Consideration of Plaintiff's pain and physical capabilities is interwoven with his assessment of Plaintiff's fatigue and mental status, thereby suggesting that ALJ Ryan took into account all of Plaintiff's impairments.  (Tr. 20-21.)  The record does not indicate that ALJ Ryan's determination of Plaintiff's impairments, in combination, should yield a different result.  This Court finds no error regarding ALJ Ryan's step three analysis.

3.    Whether ALJ Ryan Erred in Determining That Plaintiff Retains the Residual
Functional Capacity to Perform Light Work

Plaintiff argues that ALJ Ryan erred as a matter of law in utilizing the vocational rules to direct a finding of not disabled.  (Pl. Br. 15.)  Plaintiff further asserts that his non-exertional impairments prevent ALJ Ryan from making a determination that the occupational base is not eroded, unless ALJ Ryan considers additional vocational evidence.  (Id.)  This Court finds that ALJ Ryan in fact considered additional vocational evidence, and provided an explanation as to why the occupational base was not eroded. (Tr. 21.)

At step four of the sequential analysis, ALJ Ryan determined that Plaintiff's mental impairments prevented him from performing his past relevant work as a construction worker and laborer.  (Tr. 21.)  Subsequently, at step five of the sequential analysis, the burden shifted to ALJ Ryan to demonstrate that Plaintiff could still perform a variety of jobs in the national economy "considering age, education, vocational history, and residual functional capacity."  (Id.)  ALJ Ryan met this burden by noting that Plaintiff, a "younger individual" with a high school education, a vocational background as an auto mechanic, and some "unskilled work experience," could perform a variety of jobs.  (Tr. 22.)  In his analysis, ALJ Ryan referenced 20 C.F.R § 404.1568(a) to define unskilled work as "work which needs little or no judgment to do, simple duties that can be learned on the job in a short period of time."  (Id.)  ALJ Ryan then concluded that, in light of the aforementioned considerations, Plaintiff was able to perform jobs in the national economy, pursuant to the medical-vocational grid.  (Tr. 22.)

Based on a review of all the medical evidence records, this Court finds that substantial evidence supports ALJ Ryan's finding that Plaintiff had the residual functional capacity to perform light work

## IV. <u>CONCLUSION</u>

For the reasons stated above, this Court finds that the ALJ's decision is supported by

substantial evidence and is affirmed.


Date: October 31, 2007


        S/Joseph A. Greenaway, Jr.
        JOSEPH A. GREENAWAY, JR., U.S.D.J.